24-1690. Let me proceed. Good morning, Your Honor. I represent Mishai Coye, who served on the USS George Washington as a nuclear mechanics mate. So how do you pronounce your name again? Pardon? Coye?  Coye. And the issue before the Court is whether or not the Board of Corrections Naval Records erred in failing to do its job.             I am determined unfit to perform the duties of this rating in light of this manifest sleep disorder. And let me just, I'm sure you're aware of it, his name in the service records is Jesse Washington. Can I ask you, I guess, a kind of housekeeping question? Suppose we were to agree with you that the question of fitness for duty needs to go back to the Board because the Board didn't apply the specific standards for the nuclear machinists or something like that.  That's the general idea, Kelly. What other issues would, do you think, would also have to go back? Well, Judge Raynard, didn't you sit on the B panel on Friday? Did I see that? Okay. So this case has a lot of overlap with B, but it has some twists. And the twists are hopefully what this Court will resolve because there are conflicts in the Court of Claims, Court of Federal Claims below that it would be helpful to resolve. And I'll get to those in a minute. I'm not going to spend too much on Kelly. They just didn't apply it. What do we know about what his common military tasks are? Before we go there, can you tell the Court what is it that you seek? What's being sired? What's the relief? Well, I have been trying to get the Court of Federal Claims and this Court to recognize that there are certain circumstances where a sailor is unfit as a matter of law. And therefore, it is not a matter of discretion. But I have had a lot of trouble convincing judges of that. Most of the time, and I'm going to ask you to do that today. And I'm going to ask you to do that today based on the manual for the medical department. And I guess I'll jump past Kelly since everybody seems to be. Well, can I first ask, Kelly, was that issue, was the Kelly issue raised below? Kelly was, well, he didn't, I don't know if he cited Kelly. He may have. Well, is that. What he argued is they didn't. I mean, in my brief, I pointed out where each issue was preserved. He did argue that they applied the wrong disability criteria. He did argue that they didn't examine his tasks, for example. So he preserved the Kelly issue. I'm not sure if he cited Kelly by name. So the Kelly issue, as you see it, is that the board failed to consider the specific tasks. 3304 of the disability manual lists four criteria that have to be applied. Physical readiness test is not an issue. The main ones that are issue are common military tasks and deployability. And he made those arguments below. This was a pro se case, Your Honor. Remember that. Yes, he made those arguments below. But again, please, this was a pro se case. I came into this case at the reply brief stage. I do these things pro bono. At the reply brief stage in this court. In this court. I mean, I was not involved with the BCNR. I was not involved in the Court of Federal Claims. And I was not involved until the reply brief. Relevant, as I just started to say, relevant to the Kelly framework, but not addressed in B, is the issue of the effect of a medical disqualification on the fitness analysis. Mr. Kelly, Mr. Coy had a sleep disorder. I'm not sure if the government is still disputing whether it's narcolepsy, the P.E.B., which, you know, wasn't even a properly constituted P.E.B. They were told to go get it by the board to get a narcolepsy test. They didn't get a narcolepsy test. P.E.B. is Physical Evaluation Board. All right. You're much more familiar with the acronyms. Try to avoid them, please. Okay. Okay. But whatever he had, it was a sleep disorder. He had 20 witness statements in the record stating he was falling asleep on the job. And the manual of the medical department, which the government cites multiple times in its brief, and I believe it concedes is a binding on the Navy, states that in order to work in the nuclear field, you have to have, quote, a very high degree of alertness, and sleep disorders are disqualifying if they, quote, interfere with safety and reliability or foster a perception of impairment. So what I would ask the court in response to go back and what the relief is, is I think that it is clear from the record that he is medically disqualified from being a nuclear mechanics mate. And I would ask the court to say this is no longer an issue for the board to go back and exercise its discretion. We can look at the manual. We can look at what's conceded on the facts, and we can determine that it would be an abuse of discretion to say he is anything but unfit because if you are medically disqualified from doing your rating, you are unfit. That's the issue that we're trying to get the board to do. If you're not willing to go that far, then we next go to the issue of what's in the manual, which is the issue of does he have a condition that is a decided risk to his health or the welfare of other members. This is in 3302. 3302 was not discussed in Kelly, and there is a split in the Court of Federal Claims on whether this provision is mandatory, that is to say dispositive, or whether or not it is permissive. Judge Davis says it's permissive. In other words, it doesn't matter even if your continued service would be a risk to your health or endanger the welfare of others. That's not controlling. Judge Kaplan says it is even though 3302 uses the terms may consider. And her opinion in Hasse explains why that has to be so. So, again, to go back to the very beginning, one of the things that this Court can do, which would be very helpful in its appellate role, is to clarify is 3302 mandatory and dispositive, or is 3302 permissive and nondispositive? Now I'm going to go to liberal consideration. Now, while that was a long argument, Judge Rayner, that went on for an hour, and... It was the only argument of the day, if I recall. I should hope they won the prize. And a lot of that time was gone from liberal consideration. They're still suffering from it, too. So what's different here with respect to liberal consideration? What is liberal consideration in your view? You asked for it. I didn't know the names of the judges. I looked them up, and I don't know who was asking. But that was a central question in B. Now, first of all, we're not dealing with a statutory liberal consideration. He did not have PTSD, he did not need to be to TBI. This is purely CURTA. And as I think the best answer... I don't think you got a satisfactory answer in the B argument, other than the fact that everybody agrees it's a liberal, lessened evidentiary standard. Well, CURTA tells you something. CURTA tells you that if you have, like here, with a VA diagnosis something, and VA says it existed during service, CURTA member says that's persuasive evidence. So you have a whole list of things... Counsel, isn't CURTA limited to mental health? Isn't CURTA limited to mental health situations? That's the second question, how this distaste differentiates from B. The government is saying that narcolepsy is not a mental health disorder. We're saying it's... why not? I mean, it affects your behavior. Is it any less a mental health disorder than traumatic brain disorder? I don't know the answer. And the board didn't answer that question. The board said, well, you've got an honorable discharge. Hold on, hold on. So is the argument I should remand for the board or the Court of Federal Claims to decide if narcolepsy is a mental health condition? Or you could decide it. It's a question of law. What would I look to? Pardon? What would I look to to decide that question? That's why everybody spent, like, 45 minutes in B trying to figure that out. I guess you would look to whether or not the medical condition affects your behavior as opposed to, like, does it affect... Does it impair... It's not a broken arm. It's not an infection. It's something that affects how you behave on a day-to-day basis, like depression affects how you behave, or a traumatic brain injury, how quickly you make decisions. It's sort of analogous, in fact, to the kind of impairments you see with a traumatic brain injury, the lack of concentration and the like. I mean, you can send it back for a more thoughtful analysis by the Court of Federal Claims, or you can try to decide it yourself. Can I ask, is there also a question about... I guess what I'm thinking about is the limitation of... What's our case that begins with D? Doyon? Doyon, sorry, yes. So after Doyon came down, the secretary, the fellow with the V name... The Vazirani member. Vazirani, and that says liberal construction applies to a request for upgrading a discharge not to an issue like this fitness issue. That would also be a question. Is that a question also here? No. Why isn't it? Because Vazirani is limited to three things. PTSD, TBI, and military sexual trauma. He has neither of those, so technically it doesn't apply. That's the first thing. The second thing, again, another issue for this Court, if it wants to venture down the road, is in I think it's Williams versus the United States, or is it White? Judge Bonilla held it in the Court of Federal Claims, held that the Vazirani memorandum was unlawful. It's not explained. It seems to be on its face inconsistent with Doyon. I don't know how to pronounce that case. That's the... But what the Court said is... It seems to me that Vazirani was trying to follow up on CURTA, and its express limitation to those conditions suggests that CURTA doesn't apply more broadly than those conditions either. Why would that be an incorrect reading? I think the Vazirani memorandum I think the Vazirani memorandum, whatever it says, is unlawful.  It doesn't apply here, and if it does apply here... Did you make that argument in the Gray brief? Well, you know, what I said is we were seeking it on Step 1, and since I filed that brief, we've had three cases in the United States Claims Court. White, Thomas, and Jean-Pierre all deciding whether or not it's on the unfitness issue also. So, in light of the change in the law and the need for clarification on the issue, I would urge the Court to decide. A waiver is, of course, discretionary with the Court. This is a pro se case, and we do need to have that decided. Maybe you'll decide it in B, although everybody seemed to concede that the Vazirani memorandum wasn't at issue in B. Although, you know, if you go in favor of being construed as extending to the unfitness prong, it's going to, in B, it's effectively going to knock out the Vazirani because it's a statutory issue. You're well into your rebuttal time. Pardon? You're well into your rebuttal time. Would you like to reserve the two minutes you've got left? I do want to talk about the issue of a hearing.  Most quadrennial security government benefits cases allow face-to-face personal hearings. Social Security, Departments of Veterans Affairs, unemployment benefit compensation. The Board says it will allow such hearings in its regulations and on its website. A veteran has a better chance of being struck by lightning during his lifetime than getting a hearing from the Board. They just don't grant them. They've granted two since 2015. Now, you're going to ask me, where is that in the record? And I can't point to you in the record because well, I put it on my website, ChinaLightLLC.net. I got a Florida Freedom of Information Act question. I asked them, how many hearings have you held? And they said, two. You could also ask, if you have a student, to go through all the places that have been in this court. I think you're outside of your main argument. So, let's hear from the other side and I'll restore two minutes of time for rebuttal. I guess I have a minute for rebuttal. I said I'd restore two minutes for rebuttal. You'll give me two minutes for rebuttal. Thank you, Your Honor. Counselor Moses. Good morning, Your Honors, and may it please the Court. Excuse me. I do want to address a few of the questions that were raised. One in particular is the standard that's applicable here and that the Board applied. And as section 3301 of SECNAV instruction 1854E says, section 3301, the sole standard to be used in making determinations of physical disability as a basis for retirement or separation is unfitnessed to perform the duties of office grade, rank, or rating. And it goes on. As well, section 3307 says that standards and criteria not normally to be used as the sole basis for determining fitness or unfitness would be deployability, physical fitness test, or special qualification. As the Board observed at supplemental appendix page 769, this case has received far more thorough review than most service members receive through the disability evaluation system process. In addition to physical evaluation board review, Mr. Coya also, his case has been reviewed by the corrections board three times. Can I just ask for you to focus on this question, whether the particular standards for the nuclear machinists or machinists or whatever it is, I don't remember that the Board attended to those particular standards. And if it didn't, why isn't that a problem? Even if Mr. Coya has gotten more attention than most veterans. I understand, Your Honor. I don't believe that the Board specifically called out the explicit criteria or the standards for that particular job duty. But what this Court did say in Hartman v. Nicholson at PennSite 1315 is that the absence of this explicit language is not necessarily grounds for reversal. What I'll also mention is that although the Court didn't explicitly call out any particular layout that perhaps the job duties itself, it did reference that the physical evaluation board had reviewed the last three performance evaluations at Supplemental Appendix page 761 to 62. And on those performance evaluation sheets, Your Honor, one of which is at Supplemental Appendix page 639, what we have here is a description of Mr. Coya's job duties. And it goes into lots of information about his performance as it relates specifically to those job duties. So these factors were considered just perhaps not tied in a bow in the way that Mr. Coya would have liked to have seen them. How is that adequate under Kelly? Well, what Kelly says, Your Honor, at PennSite 869 is that all relevant criteria should be discussed. And the relevant criteria here, again, the sole standard to be applied is whether Mr. Coya was medically fit for duty. And time and time again, the answer has been yes. He was, there was no limitations on his duty. And the board, even for the purpose of his analysis, assumed that Mr. Coya, they gave him the benefit of the doubt, I guess you could say, that he had narcolepsy and still determined that his narcolepsy, even assuming that he had that in service, had no bearing on the misconduct, which was that he falsified, he and another sailor, falsified log entries. What about deployability? Is there any discussion of that? And if not, why isn't that a problem? There is no specific mention of deployability and that is a new issue that has been raised. Are you saying it's waived? Yes, Your Honor. And to the extent the court does not agree with that, again, there was no medical professional that ever placed any restrictions whatsoever on Mr. Coya's duties while he was on active duty. And this does suggest that he was actually deployable in the sense he could perform any job. There were no restrictions whatsoever on him. And of course, non-deployability would require medical determination and there's no evidence of that in the record here. Indeed, it's hard to imagine how the Board could have more liberally considered Mr. Coya's claim. And to the questions about whether a liberal consideration even applies here, we don't believe that it does. We believe that it's irrelevant. Why doesn't it? The whole purpose of the liberal consideration policy is to mitigate or upgrade unfavorable discharges. And what we have here, particularly in this case, as you can see at Supplemental Appendix Page 628, which is Mr. Coya's DD-214, he has the highest discharge characterization, honorable. His narrative reason is reduction in force. There's nothing stigmatizing about that. There's really nothing to mitigate here. And also, his re-enlistment code, which was later changed, he has a preferred re-enlistment. So, there's nothing, again, nothing stigmatizing about his discharge. So, it's really unclear here what he's requesting that the board would even do on remand. Because, again, the inquiry is whether he was fit for duty. And, in a way, using liberal consideration really doesn't get him anywhere. It's not like Kelly, where there was stigmatizing information on Mr. Kelly's DD-214, and liberal consideration, if applied, perhaps could have opened the door for him to have his fitness determination reconsidered. So, that's not the case here. Does the government have a view on putting all that aside, whether the Kurtz Memo or the Vazirani Memo would even apply to the condition of narcolepsy? We said in our brief, Your Honor, we don't believe that it does. There's nothing in the record that reflects that narcolepsy is a mental health disorder. And we don't believe that's within the spirit of the Kurtz Memo at all. If the Court has no further questions, we ask the Court to leave. The hearing argument, I'm not sure if you think that request is waived, but Kelly does talk about having a protected property interest at stake in these situations. Why is he not entitled under due process to a hearing? Well, we do believe, Your Honor, that that is waived. And Mr. Coya concedes at his reply brief at 21 that he's not entitled to it. That is a discretionary decision of the Board. This is not an adversarial proceeding. And in fact, when it comes to fitness, there's a presumption of fitness. So, there's a mismatch here between this liberal consideration world and fitness. Because most military service members want to be found fit for duty. Even if they have some serious injury, they want to continue to go on to serve. So again, there's a mismatch here and Mr. Coya's case has received a robust evaluation. We respectfully request that the Court affirm the trial court's decision. Thank you. Thank you, Counselor. Mr. Manning, you've got two minutes. Thank you, Your Honor. It says six here. Okay. This is pretty much why we need... Just a second. Isabel, he needs two minutes. Thank you very much. So, this pretty much illustrates why we need a hearing. Can you just go back to what do you think that formal hearing aside, I want you to put that aside, what is it that the Board would do that it hasn't already done if we said you have a Kelly problem here in the sense that you didn't advert to the full set of the regulatory standards? Sure. Just that. You would look at what his common military tasks are. All right. For example, one of his common military tasks was to regulate the steam that went to the catapults. Another of his common military tasks was to regulate the steam that turned the propellers. A third one was to regulate the water that went into the nuclear reactor. All of these things are things that you probably don't want somebody who falls asleep on the job doing. That's what we needed to have in the record. The kind of granular... It's the granularity that you think is insufficient. Exactly. Saying that he worked in the propulsion room and did a good job doesn't tell you why his narcolepsy was a danger to the ship. I mean, I lived in Harrisburg at the time of Three Mile Island, but I understand... Repeated good job over the period might tell you something. Well, so did 20 witness statements, which the board found credible, that say he fell asleep on the job constantly. Twenty. And I said in my brief, I have a difficulty reconciling his performance evaluations with those 20 witness statements. Now, as somebody who worked in government and did performance evaluations, maybe I don't have such a difficulty reconciling because I know they're figured out. Well, they're filled out. But... Yeah. I mean, we got 20... These witness statements were credible and the board did not dispute it. And the board also did not dispute that he performed critical functions, which I just described to you. Propellers, nuclear reactor, water, and catapults. I'm out of time. Well, I've got 25 seconds at the back. Do you want to conclude? Pardon? Can you conclude? Well, I guess my conclusion was I respectfully press that the court reverse. Thank you for the time. Thank you.